**United States District Court**
**Eastern District of Michigan**
**Southern Division**

The United States of America,                    Criminal No. 20-20520

                          Plaintiff,             Hon. Judith E. Levy

v.

Max Washington,

                          Defendant.
_____/

**Government's Response in Opposition to Defendant's Motion for Revocation**
**of Detention Order**

Defendant Max Washington ("Washington") is a career drug trafficker with a history of selling drugs while on probation. He is indicted on six drug-trafficking-conspiracy and drug-distribution charges. Each of these charges carry a presumption of detention. Washington faces long mandatory sentences for these crimes, and admitted to supplying large amounts of methamphetamine for distribution. When agents arrested Washington, he had crack cocaine in his pocket, and possessed approximately 25 grams of fentanyl in his mother's home. The pretrial services officer recommended detention, and after a hearing, Magistrate Judge Patricia Morris ordered Washington detained pending trial because he is a danger to the community and a flight risk. (ECF No. 31, PageID.162-64). Washington now appeals this order (ECF No. 70), but fails to rebut the presumption of detention and remains a danger

to the community and flight risk.  The Court should therefore deny Washington's motion.

## I.    Factual Background

### A.    The Government's Evidence in Support of Detention

The United States relies on its factual proffer during the October 5, 2020 detention hearing, which included (1) the pretrial services report; (2) the criminal complaint; (3) facts regarding Washington's arrest and post-arrest interview; and (4) facts regarding the execution of a search warrants at his mother's home.  The government also presented information from initial lab reports regarding the drug amounts involved in Washington's conduct.  The government has since received the final lab reports regarding those amounts, which it relies on herein.  (Lab Reports, Exs. 2-6, ECF Nos. 75-2, 75-3, 75-4, 75-5, 75-6).

The audio file for the detention hearing is embedded below, (ECF No. 63, PageID 197), and the transcript of the hearing is attached hereto, (Transcript, Ex. 1, ECF No. 75-1).



### 1.     The Pretrial Services Report

Specifically, the government proffered the following information from the pretrial services report.  Regarding Washington's employment, residence, and drug use, the government proffered (1) Washington's current lack of lawful employment, (2) that Washington reported his current residence as being in Clarkston, Michigan but he did not reside there in the days preceding his arrest; (3) that his mother failed to corroborate the Clarkston residence that he provided; (4) that Washington resided with his mother at a Detroit address for six years previously, which is where a search warrant was executed in this investigation and is the address that Washington provided during the execution of the search warrant; and (5) Washington admitted to daily cannabinoid usage, which he began at 15 years of age.

The government further proffered Washington's lengthy criminal history involving the delivery of narcotics.  First, on September 17, 2012, Washington was arrested for and ultimately pled guilty to Felony Controlled Substance Delivery of Cocaine, and the court sentenced him to 18 months' probation.  Second, on November 13, 2013, while still on probation, Washington was arrested for and ultimately pled guilty to Delivery of Cocaine and Schedule IV Narcotic.  The court sentenced him to 270 days, suspended, and continued his probation.  Third, on May 19, 2014, while still on probation, he was arrested for and ultimately pled guilty to Delivery of Cocaine.  The court sentenced him to 18 to 30 months' custody and discharged him without improvement from probation.  Fourth, on June 16, 2017,

Washington was arrested for and ultimately pled guilty to two counts of Delivery of Cocaine.  The court sentenced him to 18 to 30 months' custody, and he was discharged from parole on December 18, 2019.

Finally, the government proffered pretrial services' findings that (1) Washington poses a risk of non-appearance based on his substance abuse history, lack of verifiable employment, and criminal history while under supervision, and (2) Washington poses a risk of danger based on his prior arrests and convictions, the nature of the instant offense, his substance abuse history, his criminal associations, and his history of a pattern of similar criminal activity.

### 2.    The Criminal Complaint and Facts Regarding Washington's Arrest and the Execution of a Search Warrant

The government further proffered the following facts from the criminal complaint, (ECF No. 1), and Washington's post-arrest interview.  In this drug-trafficking conspiracy, Washington is a supplier.   He supplied codefendant Ramone Martin with the methamphetamine—including over 100 grams of 98% pure meth—purchased by the undercover agent, and admitted to this role during his post-arrest interview.

Specifically, Washington supplied the methamphetamine sold in three undercover drug buys—55.5 grams of 75% pure meth and 55.8 and 55.6 grams of 98% pure meth—all of which were audio and video recorded.  Through those buys, the undercover agent purchased six ounces of methamphetamine for $5,950.  While

Martin was out of town for an undercover methamphetamine deal, Washington coordinated the distribution of methamphetamine with codefendant Jayquan Coleman before the deal, and picked up the proceeds of Jayquan Coleman's methamphetamine sales immediately following the deal.  Washington admitted this during his post-arrest interview.  Moreover, agents saw Washington driving in rental vehicles during surveillance surrounding the undercover buys, and Washington admitted that a friend of his handles his "rentals."  Washington also admitted to picking up the proceeds of methamphetamine sales from Jayquan Coleman on at least three occasions.

Further, upon Washington's arrest in Port Huron, law enforcement discovered 3.2 grams of crack cocaine in his pocket.[1]  Washington admitted to possessing the crack cocaine and also admitted that he uses powder cocaine.  During a search of Washington's Port Huron residence, law enforcement also found drug paraphernalia, a digital scale, and $8,000 in cash, all of which he admitted to owning.  During a search of a bedroom at his mother's house at the Detroit address, agents discovered 24.42 grams fentanyl, drug paraphernalia, and tax documents addressed to Washington.[2]  Additionally, Washington admitted to possessing cutting agent at his mother's house, which he used to cook or stretch narcotics.

---

[1] At the detention hearing, the government proffered that law enforcement found four grams of crack based on the data provided in initial lab reports received.  After the hearing, the government received an updated lab report reflecting 3.2 grams of crack cocaine.  (Ex. 3, ECF No. 75-2).
[2] At the detention hearing, the government proffered that law enforcement found 36 grams of suspected cocaine at the residence.  After the hearing, the government

### 3. Lab Reports

As reflected in the lab reports, the drug amounts attributable to Washington include 150.5 grams of methamphetamine--108 grams of which was 98% pure methamphetamine--24.24 grams fentanyl, and 3.2 grams crack cocaine.  (Lab Reports, Exs. 2-6, ECF Nos. 75-2, 75-3, 75-4, 75-5, 75-6).

## B. The Magistrate Judge's Order of Detention

After defense counsel's proffer and argument, the Magistrate Judge considered the necessary factors under 18 U.S.C. § 3142(g) and found that Washington failed to rebut the applicable presumption of detention.  First, as to the nature and circumstances of the offense, the Magistrate Judge found that drug trafficking in and of itself presents a serious danger to the community and other persons.  In so doing, she emphasized that Washington was found with nearly 100g of pure methamphetamine, four grams of cocaine, a large amount of cash, and that agents found drug paraphernalia and cocaine at his mother's house.  Second, the Magistrate Judge noted that the court must consider the weight of the evidence regarding detention, not guilt.  Third, as to Washington's history and characteristics, the Magistrate Judge found weighing in Washington's favor that he is young, in good health, has no mental health issues, and has good connections to the community, despite his inconsistent statements regarding his residence.  She found that

---

received an updated lab report reflecting 24.42 grams of fentanyl.  (Ex. 3, ECF No. 75-3).

Washington's criminal history weighed against release, however, explaining that it reflects a strong pattern of drug-trafficking activity with multiple offenses and convictions.  The Magistrate Judge went on to acknowledge Washington's admissions to law enforcement regarding his conduct in this case but noted that he now faces a 25-year mandatory minimum for that conduct.

Weighing these factors, the Magistrate Judge ultimately determined that the danger that Washington's consistent pattern of drug trafficking activity poses to the community and himself outweighs his connection to the community and his admissions to law enforcement.  In so doing, the Magistrate Judge noted that Washington's admissions were to conduct that itself poses a danger to the community.

Based on the above, the Magistrate Judge found, by clear and convincing evidence, that no condition or combination of conditions of release would assure the safety of the community and ordered Washington detained.  (Detention Order, ECF No. 31, PageID.163).  The Magistrate Judge further found, by a preponderance of the evidence, that no condition or combination of conditions would reasonable assure Washington's appearance as required.  (*Id.*).  The Magistrate Judge expressly indicated in her order that in addition to the findings made on the record at the hearing, detention is supported by: (1) the strong weight of the evidence, (2) the lengthy period of incarceration that Washington faces if convicted, (3) Washington's criminal history, and (4) Washington's participation in criminal activity while on probation.  (*Id.*).

7

Washington now moves to revoke the detention order.  (ECF No. 70).  For the following reasons, the Court should deny Washington's motion.

## II.    Argument

### A.    Standard of Review

Under 18 U.S.C. § 3145, this Court reviews a magistrate judge's pretrial order *de novo*.  *See United States v. Yamini*, 91 F. Supp. 2d 1125, 1128-29 (S.D. Ohio Feb. 24, 2000) (collecting cases).

The United States moved for detention under 18 U.S.C. § 3142(f)(1)(C) because the charges involve a drug offense punishable by 10 years or more.  The government sought detention on non-appearance and dangerousness grounds.

For each of Washington's six drug-trafficking chargers, there is a statutory presumption of detention, 18 U.S.C. § 3142(e)(3)(A), which Washington may rebut if he "comes forward with evidence that he does not pose a danger to the community or a risk of flight."  *United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010).  Once a defendant satisfies his burden of production, "the presumption favoring detention does not disappear entirely, but remains a factor to be considered among those weighed by the district court."  *Id.* (internal citation omitted).  "The presumption remains a factor because it is not simply an evidentiary tool designed for the courts. Instead, the presumption reflects Congress's substantive judgment that particular classes of offenders should ordinarily be detained prior to trial."  *Id.* "To rebut the presumption, therefore, a defendant should present all the special features of his case

that take it outside the congressional paradigm." *Id.* at 946 (internal citations and quotations omitted).

In addition to the presumption of detention, the Court must consider the following factors: (1) the nature and circumstances of the offense; (2) the weight of the evidence as it relates to dangerousness and risk of flight; (3) the defendant's history and characteristics, and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. 18 U.S.C. § 3142(g).

## B. Washington, a career drug trafficker, is a danger to the community.

The Section 3142(g)(1) factors weigh heavily in favor of Washington's detention. First, the nature and circumstances of the offense demonstrate that Washington presents a danger to the community. He supplied over 100 grams of almost 100% pure methamphetamine to his codefendants to sell, and he shared in the proceeds. He also possessed a distribution amount of fentanyl, 24.42 grams, as well as cutting agent, a scale, and other drug paraphernalia at two separate residences. All of this reflects Washington's role as a serious drug dealer and danger to the community. Indeed, "drug trafficking is a serious offense that, in itself, poses a danger to the community." *Stone*, 608 F.3d at 947, n. 6; *see also United States v. Leon*, 766 F. 2d 77, 81 (2d Cir. 1985) ("the harm to society caused by narcotics trafficking is encompassed within Congress's definition of 'danger'"). To that end, the Sixth

9

Circuit "routinely affirms, on dangerousness grounds, the pre-trial detention of run-of-the-mill drug dealers, even without any indication that the defendant has engaged in violence." *Stone*, 608 F.3d at 947 n.6; *see also United States v. Gray*, 20 F. App'x 473 (6th Cir. 2001) (in conspiracy to possess with intent to distribute cocaine, testimony from family members was insufficient to overcome the presumption of detention). Here, Washington is even more than just a run-of-the mill drug dealer—he is a large methamphetamine supplier.

In addition, if convicted, Washington is facing, *at minimum*, a mandatory sentence of 10 years' imprisonment, and based on his criminal history, he could face a mandatory minimum sentence of 15 or 25 years' imprisonment, which further reflects the serious nature of his drug-trafficking crimes. *See* 21 U.S.C. § 841(b)(1)(A) (mandatory minimum ten-year sentence), 21 U.S.C. § 841(b)(1)(A)(viii) (increasing mandatory minimum sentence to 15 years if the defendant has one prior serious drug felony, and to 25 years if the defendant has two such priors); *see, e.g.*, *Baldwin v. N.Y.*, 399 U.S. 66, 68 (1970) ("In deciding whether an offense is 'petty,' we have sought objective criteria reflecting the seriousness with which society regards the offense . . . and we have found the most relevant such criteria in the severity of the maximum authorized penalty."). Thus, this factor weighs heavily in favor of detention.

In arguing to the contrary, Washington places great weight on the fact that he cooperated with law enforcement by admitting some of his conduct. The Magistrate

Judge correctly recognized, however, that his admissions weigh against release, as they were to the very conduct that makes him a danger to the community.

The weight of the evidence likewise supports detention. The weight of the evidence "goes to the weight of the evidence of dangerousness, not the weight of the evidence of the defendant's guilt." *Stone*, 608 F.3d at 948. "[S]trong evidence against a person . . . could increase the likelihood of danger to the community because they could believe that they are more likely to be incarcerated in the future, causing them to be more likely to engage in dangerous behavior." *United States v. Rice*, No. 3:04CR-83-R, 2006 WL 1687749, at *2 (W.D. Ky. June 19, 2006). The weight of the evidence against Washington—his criminal history, the drugs and drug paraphernalia found on his person and at his residences, the large amount of cash recovered, the recorded undercover drug buys, and his admission to supplying methamphetamine—is very strong, which makes it more likely that he will engage in dangerous behavior, particularly when considered in connection with the high mandatory-minimum sentence that he faces.

Washington's history and characteristics further support detention. Washington is a career drug trafficker. Between the ages of 21 and 29 years old, Washington sustained *four* convictions for the delivery of cocaine, two of which occurred while on probation. In other words, he continued to traffic drugs while on supervision for the very same conduct. And he has no lawful employment. Yet he had over $8,000 in cash when arrested. Given this history, there are no conditions

that will reasonably assure the Court that Washington will not continue his drug dealing if released pending trial. Moreover, as explained in greater detail below, his history demonstrates that there are no conditions that will reasonably assure the Court that Washington will appear for future hearings as required.

For all of these reasons, Washington has not rebutted the presumption of detention. Washington is the type of offender that, in Congress's "substantive judgment . . . should ordinarily be detained prior to trial . . ., and he does not present "special features" that take his case "outside the congressional paradigm." *Stone*, 608 F.3d at 945-46.

Washington's motion for release fails to identify any factors to rebut the presumption of detention. Washington proposes in his motion that he would live with his fiancé and 6-year-old son. But the presence of his son did not deter him from selling drugs in this case. Washington also states that he would be welcome at his mother's house. But his mother's house is where he kept 24.42 grams of fentanyl, cutting agent, and drug paraphernalia. And ATF surveillance saw an unindicted conspirator leave this home and meet with Jayquan Coleman before an undercover meth deal. During another undercover meth deal with Ramone Martin, agents observed Washington at this home.

Notably, Washington's generalized and unsupported assertions about the risk of exposure to COVID-19 in jail and his weight and blood pressure are insufficient to outweigh the factors warranting detention. Although the Court may consider a

12

defendant's physical health in its detention decisions, Washington does not allege that he has contracted COVID-19 or that he has been exposed to any individuals with COVID-19. Although obesity places individuals at a high risk of developing severe illness if they contract COVID-19, and high blood pressure *may* place individuals at a high risk, Washington provides no evidence that he falls into either category of persons. In fact, Washington told pretrial services, and his mother confirmed, that "he is in excellent physical health with no medical problems reported." (Pretrial Services Rept.). Washington's request for relief is thus based solely on the *possibility* that he may become ill with COVID-19 at some future time while in detention. This speculative concern does not rebut the presumption of detention.

Indeed, while COVID-19 presents certain risks for all persons, inmates included, Washington is no different than many other detainees who are currently in custody. The speculative prospect of exposure to COVID-19 does not diminish the public interest in keeping dangerous offenders off the streets. Further, releasing inmates to home detention and electronic monitoring, as Washington requests, would place an undue burden on Pretrial Services and expose its officers to greater health risks while attempting to supervise these individuals in the community.

Washington's speculative concerns about possible future exposure in the jail should not be permitted to overwhelm the careful balance of factors prescribed by Congress in determining whether he is properly subject to pretrial detention. *See United States v. Johnson*, No. 19-CR-20437, ECF No. 53 (E.D.M.I. Mar. 26, 2020) (Leitman, J.)

(denying defendant's motion to revoke detention order, after analyzing statutory presumption and § 3142(g) factors, and noting "based upon the balance of factors described above, the Court is not persuaded that the COVID-19 pandemic justifies releasing [defendant] prior to trial"); *United States v. Martin*, No. PWG-19-140-13, 2020 WL 1274857, at *2 (D. Md. Mar. 17, 2020) (rejecting similar argument and noting that "as concerning as the COVID-19 pandemic is," the court's consideration "must in the first instance be an individualized assessment of the factors identified by the Bail Reform Act."); *see also United States v. Raia*, Case No. 20-1033, at 8 (3rd Cir. April 2, 2020) ("But the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread.").

Moreover, electronic monitoring is not a sufficient condition to ensure Washington will not pose a danger. Washington has already twice demonstrated that he cannot abide by the terms of supervision. Washington has shown that he is capable of supplying drugs from any residence, and an electronic monitor would have no effect. The Court therefore has no reason to believe that Washington would not return to the very same conduct if released to his fiancé's or mother's residence.

**B.      Washington, who has demonstrated an inability to comply with terms of supervision, presents a risk of flight.**

The Court should also detain Washington on the ground that he poses a risk of non-appearance for further court proceedings.  The evidence establishes, by a preponderance of the evidence, that no conditions will reasonably assure Washington's appearance as required.  Indeed, he has twice violated the terms of his probation by continuing to sell drugs, demonstrating that he is not amenable to supervision.  Moreover, the Court cannot be confident that he will remain at a single, stable residence.  Washington told pretrial services that he was living in Clarkston, he told agents that he was living in Detroit—where surveillance observed him during one of the undercover meth sales and where agents executed a search warrant and found fentanyl—and he was arrested in Port Huron—in possession of crack, drug paraphernalia, and a large amount of cash.  His potential sentence is also *significantly* longer than any he has served, further incentivizing non-appearance.  And he lacks legitimate employment and has a history of substance abuse, which increases his non-appearance risk.

As discussed above, the weight of the evidence against Washington is strong—Washington admitted to supplying methamphetamine to his codefendants, and agents found crack cocaine in his pocket, and fentanyl and drug paraphernalia at two of his residences.  Such strong evidence, coupled with the lengthy sentence Washington faces, increases Washington's risk of flight.  *Rice*, 2006 WL 1687749, at *2.  ("[W]hen

15

considering the weight of the evidence against the person, the judicial officer is to consider how the weight of the evidence would affect the person's dangerousness or risk of flight—for example, strong evidence against a person could increase their risk of flight because they are likely to be convicted[.]").  Thus, the nature and circumstances of the offense, including the mandatory-minimum sentence, and Washington's history of violating probation, demonstrate by a preponderance of the evidence that there are no conditions or combinations of conditions that will reasonably assure his appearance as required.  Accordingly, the Court should detain Washington on this additional ground.

## III.    Conclusion

For the foregoing reasons, the Court should deny Washington's motion and continue his detention pending trial.

Respectfully Submitted,

Matthew Schneider
United States Attorney

*/s Ranya Elzein*
Danielle Asher
Ranya Elzein
Assistant United States Attorneys
211 West Fort Street, Suite 2001
Detroit, Michigan  48226-3211
(313) 226-9518/0213
danielle.asher@usdoj.gov
ranya.elzein@usdoj.gov

Date: November 12, 2020

## **Certificate of Service**

I hereby certify that on November 12, 2020, I electronically filed the foregoing document with the Clerk of the Court using the ECF system, which will send notification to the attorney of record.

*/s Ranya Elzein*
Ranya Elzein
Assistant United States Attorney
211 West Fort Street, Suite 2001
Detroit, Michigan  48226-3211
(313) 226-0213
ranya.elzein@usdoj.gov
